**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA**

Tyreese Learmond,
Plaintiff,

v.

Anthony Schutz, Professor, University of Nebraska College of Law; David Dirgo, Adjunct Instructor, University of Nebraska College of Law; Chelsi K. Hayden, Professor, University of Nebraska College of Law; Harvey Perlman, Professor, University of Nebraska College of Law; Danielle Cheree Jefferis, Professor, University of Nebraska College of Law; Molly Brummond, Professor and Associate Dean, University of Nebraska College of Law; Richard Edward Moberly, Dean and Professor, University of Nebraska College of Law; John Backer, Captain, University of Nebraska-Lincoln Police Department; Board of Regents of the University of Nebraska; State of Nebraska; Linda McMahon, Secretary of Education, in her official capacity; United States Dep't of Education; American Bar Association.
Defendants.

Case No: 4:26-cv-03285-BCB-JMD

**Combined Response to Defendants' Motions to Dismiss**

## 1. Introduction

Plaintiff submits this response to oppose Defendant State of Nebraska Fed. R. Civ. P. 12(b)(6) Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted. Plaintiff submits this same response to oppose the University (BRUN) Defendants' Fed. R. Civ. P. 12(b)(6) Motion to Dismiss, filed November 9, 2026, and addresses that motion in Part II below. One brief answers both motions because the motions rest on the same record: the First Amended Complaint, taken as true.

**2. Background**

This action originating in the Third Judicial District Court of Lancaster County, Nebraska brings seven (7) claims against the State of Nebraska. The State alleges that it should be dismissed from all claims against it because none state a claim upon which relief can be granted. The University (BRUN) Defendants — the Board of Regents of the University of Nebraska and the individual University defendants — likewise moved to dismiss the claims against them, and Plaintiff answers their motion in Part II of this response.

**3. Summary of the Argument**

Defendants will have you believe that I am disgruntled about not returning to their law school. I am as disgruntled about not returning to their law school as I am about living in Florida. I prefer the snow.

**The Verified Complaint**

The verified complaint stands on its own paragraphs. The First Amended Complaint is a verified complaint, executed and sworn on October 26, 2026. Even absent the exhibits, the complaint is verified; the exhibits are corroboration, not the claim itself. The counts are pleaded in the numbered paragraphs themselves — specific acts, specific dates, and quoted words — not merely by reference to exhibits. If the Court disregards any exhibit, the sworn allegations in the paragraphs still stand as true, with every reasonable inference in Plaintiff's favor.

Standard of review. A complaint survives Rule 12(b)(6) when it pleads enough factual content to state a claim that is plausible on its face. The Court accepts all factual allegations as true and disregards only legal conclusions. Plaintiff proceeds *pro se*; his pleading is held to less stringent standards and construed liberally. Plaintiff pleads in the alternative for leave to amend

under Rule 15(a)(2) as to any count the Court finds wanting.

**PART I — Response to the State of Nebraska's Motion to Dismiss (Entries 29/30)**

**4. Argument**

**1. Defendants' Sovereign Immunity Defenses Fail Because They Waive Sovereign Immunity for Title VI Claims Alleging Deliberate Indifference, and Severe, Pervasive, and Objectively Offensive Conduct.**

Congress removed this defense by statute. "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of" Title VI of the Civil Rights Act of 1964. 42 U.S.C. § 2000d-7(a)(1). The Board of Regents and the State of Nebraska accepted federal financial assistance on those terms, and the waiver is pleaded on the face of the complaint: "By accepting federal financial assistance, Defendant Board of Regents and Defendant State of Nebraska have waived sovereign immunity for Plaintiff's claims under Title VI and Section 504 of the Rehabilitation Act pursuant to 42 U.S.C. § 2000d-7." (FAC ¶20; see also FAC ¶137.) Sovereign immunity is therefore not a defense to Count I at all, and the State's immunity argument as to Title VI fails before it begins.

What remains is the merits standard the State invokes — deliberate indifference — and the complaint pleads it directly. Count I alleges that "[a]ll Defendants had actual knowledge of the harassment and hazing, recklessly participated in it and acted with deliberate indifference, allowing the mistreatment to continue." (FAC ¶145.) It alleges that "Defendant's conduct demonstrated deliberate indifference to Plaintiff's rights," and that Plaintiff was "treated Plaintiff differently from other students of different races and visibility." (FAC ¶138.) The indifference was not an abstraction: notice ran to the officials with authority to act. Defendant Jefferis's

January 19, 2026 "Student of Concern" email was sent to Defendant Brummond and forwarded by her to Dean Moberly the same evening (FAC ¶¶88–89); before Plaintiff was reassigned, Brummond consulted a University police investigator about "who to assign him to" (FAC ¶90), and the reassignment was settled with the Dean (FAC ¶91). When Plaintiff later used the University's own reporting channel, the Associate Vice Chancellor for Faculty Affairs had to ask the Dean, "Is this something you can follow up on?" (FAC ¶92), and the Dean's office never offered Plaintiff the formal grievance channels or grade appeal the College's own regulations provide (FAC ¶¶93–94). Notice to Brummond and Moberly is notice to appropriate persons with corrective authority; the State's argument that Plaintiff notified only its Risk Manager misdescribes the pleading.

Severity and pervasiveness are likewise pleaded as facts, not conclusions. Count I alleges the targeting "relied entirely on coded racial proxies, hyper-surveillance of a highly visible minority student's presence, and bad-faith academic pretexts that were never uniformly applied to Caucasian or non-Black student peers" (FAC ¶139); that Defendant Jefferis leveled an "entirely groundless accusation of an academic policy violation" and then immediately reversed it — "Tyreese I have marked the assignment complete" (FAC ¶¶140, 142); and that non-Black peers "were routinely afforded the presumption of academic honesty" (FAC ¶141). The underlying facts span Plaintiff's enrollment: he was "visibly the only student in the 2028 class who consistently wore a suit each day," making him "uniquely identifiable" (FAC ¶30), and the conduct directed at that identifiability runs through the complaint's factual allegations. Whether a pleaded course of conduct is severe, pervasive, and objectively offensive is a fact-intensive judgment; on a motion to dismiss, the pleaded pattern is taken as true.

**2. Defendants' Sovereign Immunity Claims Defenses Fail Because They Waive Sovereign Immunity for Claims Satisfying STCA and SCCA Procedures**

The complaint pleads compliance with both Acts, item by item, with dates and dispositions. Under the State Tort Claims Act, Plaintiff "filed claims with the State of Nebraska Risk Management Office" on March 27, 2026, "fully exhausting his administrative remedies regarding the tortious conduct claims" (FAC ¶122), and on August 11, 2026 he received the State Risk Manager's notices that "the claim board denied his March 27, 2026 STCA claims" (FAC ¶128). Denial by the Claims Board is the event the Act makes the gateway to suit; it is pleaded, not assumed.

Under the State Contract Claims Act, the State's lead argument — that an implied contract cannot supply the "copy of the contract allegedly breached" required by Neb. Rev. Stat. § 81-8,304(1) — is answered by the pleading in the statute's own terms: "A copy of the contract was attached to Plaintiff's claim as filed. Plaintiff's claim as filed included a copy of the contract allegedly breached, the manner in which the contract was allegedly breached, and the damages incurred as a result of the alleged breach." (FAC ¶123.) The claim was filed June 4, 2026 (FAC ¶123), and the process the Act prescribes actually ran: on July 23, 2026, Plaintiff received the Risk Management letter reporting that the University of Nebraska objected to his contract claim, Claim 26-14271 (FAC ¶127). A defendant that received the copy, objected to the claim on its merits through the statutory process, and denied the companion tort claims is not positioned to say the procedures were not satisfied.

The State's related argument — that the complaint recites Neb. Rev. Stat. §§ 25-21,206 and 25-21,202 "only formulaically" — fails on the same record. Section 25-21,202 is pleaded

with the claims themselves: the State "is the respondent to Plaintiff's claims under the Nebraska State Tort Claims Act … and the State Contract Claims Act … and is liable as alleged in this complaint pursuant to Neb. Rev. Stat. § 25-21,202(4) and (5)." (FAC ¶10.) What follows that allegation is not a formula but a chronology: two filings, an agency objection, and two dispositions, each dated (FAC ¶¶122–128). Formulaic recitation is the pleading of elements without facts; here the facts are the elements.

The State's final waiver argument invokes the State Tort Claims Act's intentional-tort exemption, Neb. Rev. Stat. § 81-8,219(4), citing *Joshua M. v. State*, 316 Neb. 446 (2024). Three answers. First, the exemption is a limit on the Tort Claims Act; it does not reach the contract claims, which proceed under the Contract Claims Act and the copy-pleaded filing at FAC ¶123. Second, the negligence Plaintiff pleads is the institution's own: the College published a complaints process and never offered it to him (FAC ¶94); his complaints were routed to a police investigator and a threat-assessment administrator instead (FAC ¶¶90–94); and the State's own notices went unanswered (FAC ¶¶132–133). Those are omissions by the institution under duties it assumed in its own published regulations, pleaded as independent negligence — not a claim that merely relabels an employee's intentional tort. *Joshua M.*, as the State presents it, addressed claims arising out of an employee's assault; it did not hold that an institution's documented failure to follow its own grievance procedures is exempt whenever an intentional act appears anywhere in the background. Third, the exemption is an affirmative limitation the State must establish; where the complaint pleads independent institutional duties and breaches, dismissal at the pleading stage on exemption grounds is premature.

**3. Defendants' Sovereign Immunity Claims Defenses Fail Because a Defendant Who**

**Removes a Case Cannot Then Claim Sovereign Immunity from Suit in the Federal Forum**

This case is in federal court because the defendants put it here. "This action was originally filed in the District Court of Lancaster County, Nebraska, Case No. CI 26-3107, and was removed to this Court by the Defendants on September 17, 2026, pursuant to 28 U.S.C. § 1441(a)." (FAC ¶19.) Under *Lapides v. Board of Regents*, 535 U.S. 613 (2002), a State that voluntarily removes a case to federal court waives its Eleventh Amendment immunity for the claims its own law made actionable in its own courts. Nebraska made contract and tort claims against itself actionable in its own courts through the State Contract Claims Act and the State Tort Claims Act, and Plaintiff pleaded compliance with both (FAC ¶¶122–123, 127–128). Defendants invoked the jurisdiction of this Court to escape the forum where those waivers operate; they cannot invoke an immunity in this Court that their own removal surrendered.

Plaintiff states the scope of this argument exactly: *Lapides* waives immunity for the state-law claims within Nebraska's waivers — Counts II, III, and IV. Plaintiff does not contend that removal waives immunity for the federal claims; those rest on the grounds stated in Argument points 1 and 4. A removal waiver argued within its limits is not a blanket waiver, and the State's brief does not answer it within those limits.

**4. Defenses Sovereign Immunity Claims**

The State's remaining immunity arguments do not reach the claims actually pleaded against it.

*Section 1983 and Will.* The State argues that a State is not a "person" under 42 U.S.C. § 1983, citing *Will v. Michigan Department of State Police*. Plaintiff's § 1983 counts are not pleaded against the State as a damages defendant: Counts VI, VII, and VIII are captioned against

the individual defendants, who are sued in their individual and official capacities (FAC ¶18), and the claims pleaded against the State are Counts I through V and IX — Title VI, the state-law contract and negligence counts, and the ADA/Section 504 count — as the count captions show. *Will answers a claim Plaintiff did not make against this defendant.* The same is true of the State's effort to recharacterize Count III — captioned "Breach of Implied Contract — Chilled Speech" (FAC ¶¶153–157) — as a disguised § 1983 claim: Count III pleads an implied contract arising from "the university's official policies, student codes of conduct, guarantees of academic freedom, and explicit institutional commitments" (FAC ¶154), and it stands or falls as the contract claim it is pleaded to be.

*The ADA.* The State argues that Title II's abrogation of immunity reaches only conduct actually violating the Fourteenth Amendment, citing *United States v. Georgia*, 546 U.S. 151 (2006). Plaintiff leads with Section 504, not the ADA: for the identical conduct, Section 504 proceeds on the express waiver of 42 U.S.C. § 2000d-7, pleaded at FAC ¶20, and Count IX pleads that the Board "receives federal financial assistance" and that Section 504 "prohibits discrimination on the basis of disability in any program or activity receiving federal financial assistance." (FAC ¶199.) The ADA is pleaded in the alternative, as *Tennessee v. Lane*, 541 U.S. 509 (2004), and *Georgia* permit: Title II's abrogation is valid as applied to conduct that violates the Fourteenth Amendment, and Count IX pleads on its face that "[t]he conduct alleged in this Count also violates the Fourteenth Amendment to the United States Constitution" (FAC ¶199), while Counts VI, VII, and VIII plead that underlying constitutional conduct against the same institution for the same period. Plaintiff asserts no blanket ADA waiver. Whether the pleaded conduct violates the Fourteenth Amendment is the merits question *Georgia* frames; it is not

resolved against the pleader, on the pleadings, by the defendant's characterization of its own conduct. The therapy the State cites was not an academic accommodation. Defendants provided the therapy only as the condition that will allow Plaintiff to return to classes: they required Plaintiff to visit a school therapist with Counseling and Psychological Services, among the actions he had to take after his removal from Defendant Dirgo's class (FAC ¶¶69–70). The office the school assigned to disability accommodations did not engage Plaintiff in a process to discover what accommodations he may need. Plaintiff applied to SSD in January 2026 for extra time on exams and submitted the provider-signed documentation SSD requested (FAC ¶71). SSD, through Assistant Director Pablo Rangel, never approved the request, never denied it, and never asked for further documentation; SSD concluded that the request was not trustworthy (FAC ¶73). Defendant Brummond reported that SSD was “very suspicious” because Plaintiff gave a Gmail address to reach his provider instead of a phone number, and that Rangel was talking with Barb about how to proceed; SSD never proceeded (FAC ¶74). Count IX pleads the failure in terms: SSD “failed to engage in a meaningful interactive process” and “instead subjected him to administrative barriers” (FAC ¶202).

**5. The State is Liable on Count I through VII Because the BRUN Defendants are arms of the State.**

Defendant State and the BRUN Defendants are one entity when considered in their official capacities. All rights, privileges, duties and obligations vested to the State are vested to the BRUN Defendants without quantification or qualification. Without the vesting of those same rights etc., the BRUN Defendants have no recourse to the State's protections and the protections they claim in these proceedings. The BRUN Defendants cast themselves as representatives of the

State and the State casts the BRUN Defendants as representing it. Any actions of the BRUN Defendants are attributable to the State of Nebraska as a vested body politic separate from its persons.

**6. The State is Liable on All Counts Against It Because it Was Duly Notified of the Actions Alleged in the Complaint and through its Agents, Were Indifferent to Plaintiff's Complaints and Tacitly Authorized Continued Harmful Conduct.**

The State was notified of the claims against it beginning on January 13, 2026 when Defendant Molly Brummond was notified of the injuries Plaintiff alleges in the complaint. The State was again notified on March 27, 2026 when Plaintiff submitted a tort claim for each incident anchoring this complaint: September 2, 2025 interaction with Defendant Anthony Schutz,

The State was again notified of the injurious conducts stated in this complaint on June 4, 2026, when the Plaintiff informed Defendant Brummond of the April 6th, 2026 incident with Defendant Schutz. The State was again notified on June 7, 2026, and July 9, 2026 and actively chose to continue to do nothing. Doing nothing does not correct a person's injuries from a defendant's conduct.

**7. The State is Liable on All Counts Against It Because Upon Notification, It Chose to Continue to Allow the Named Defendants to Interact with the Plaintiff Causing Further Harm.**

The State is liable for all counts against it because upon notification, it actively conducted itself as if it was not aware that a grievance was developing between the Plaintiff and Defendant Jefferis and Schutz. Defendant Brummond actively behaved as though she was not aware that

Defendant Jefferis was harboring a personality animosity against the Plaintiff. Defendant Brummond actively conducted himself in the same way and as the individuals with any measure of authority to separate the Plaintiff and Defendant from each other prior to this action, they continued to cast themselves as state actors and chose to do nothing. The State, through BRUN, continued to cast itself and them as one unified entity and for that reason, the State is liable for claims brought against it.

**8. The State's Standing and "Redundant Defendant" Arguments Fail**

The State argues that Plaintiff's injuries are not fairly traceable to the State itself, and that the State is a redundant defendant because the Board can be sued. Standing is assessed defendant by defendant, and the complaint pleads the State's own part with the same specificity as every other defendant's. The State is in this case by statute: it "is the respondent to Plaintiff's claims under the Nebraska State Tort Claims Act … and the State Contract Claims Act … and is liable as alleged in this complaint pursuant to Neb. Rev. Stat. § 25-21,202(4) and (5)." (FAC ¶10.) A sovereign acts through its apparatus, and Plaintiff pleaded that apparatus in operation: his claims were filed with the State's Risk Management Office (FAC ¶¶122–123), the University's objection to his contract claim was transmitted through that office (FAC ¶127), the State's Claims Board denied his tort claims (FAC ¶128), and before suit Plaintiff notified the Board's Corporate Secretary of his intent to file, with a demand for remediation (FAC ¶132), and followed up with the Board's Chief General Counsel and Corporate Secretary, setting a final date for informal resolution that passed without one (FAC ¶133). The injuries the claims process exists to remedy were placed before the State through the only channels the State provides, and the State's own dispositions are links in the causal chain — not, as the State would have it, proof that the chain

does not reach it.

As for redundancy: no provision of Rule 12 makes a claim dismissible because a co-defendant is also liable for it. The Nebraska Legislature made the State the respondent for these claims by statute (FAC ¶10); a defendant designated by statute is not redundant as a matter of pleading. The argument is also at war with the State's own posture in this litigation, as Plaintiff states in Argument point 5: the State and the BRUN defendants claim each other's protections when immunity is asserted and disown each other when liability is assigned. If the Court were nevertheless to agree with the State, the counts survive identically against the Board, and Plaintiff pleads that in the alternative; the State's redundancy argument, even if accepted, dismisses nothing.

**PART II — Response to the University (BRUN) Defendants' Motion to Dismiss (Entries 35/36)**

**5. Argument — Part II**

**1. Sovereign Immunity Does Not Bar the Constitutional Claims as Pleaded (Entry 36 § A)**

The University defendants argue that sovereign immunity bars the constitutional claims against BRUN and against the individual defendants to the extent they are sued in their official capacities. The complaint's capacities are pleaded: the individual defendants acted "in their individual and official capacities" (FAC ¶18), and the § 1983 damages claims (Counts VI, VII, and VIII) are captioned against the individual defendants. Damages against individuals in their individual capacities do not implicate *Will v. Michigan* or the State's immunity. The claims against BRUN itself proceed on independent footing: Title VI and Section 504 on the express waiver of 42 U.S.C. § 2000d-7 (FAC ¶20), and the state-law counts on the pleaded STCA/SCCA

compliance (FAC ¶¶122–123, 127–128) and the *Lapides* removal waiver (FAC ¶19), as stated in Part I, Argument points 1–3. Immunity, argued defendant by defendant and count by count as the pleading requires, does not support the blanket dismissal § A requests. The complaint does not mention Ex parte Young. The defendants' discussion of that doctrine answers an argument Plaintiff does not make; Plaintiff pleads no Young claim and seeks no relief under it.

**2. The Tort Claims Act Does Not Channel Claims Pleading Conduct Outside the Scope of Employment (Entry 36 § B)**

The University defendants argue that sovereign immunity and the State Tort Claims Act bar the state-law tort claims against the individual defendants. The Act channels claims for conduct within the scope of employment. The complaint pleads the opposite: in Count V, "[t]he individual Defendants acted outside the scope of their employment duties in engaging in the conduct alleged in this Count" (FAC ¶167), and Count XI pleads the defendants acted in their individual capacities and outside the scope of their employment (FAC ¶212). Whether conduct was within the scope is a fact question; on the pleadings, the allegation is taken as true, and the channeling argument fails on the complaint's own terms.

**3. The Implied Contract Claims Identify Their Terms — in the College's Own Publications (Entry 36 § C)**

The University defendants argue that Counts II and III fall outside the SCCA's waiver and identify no contract term. Both points are answered in Part I, Argument point 2, as to the waiver: the SCCA filing, with a copy of the contract attached, the manner of breach, and the damages, is pleaded at FAC ¶123. As to terms, they are identified, and they are the College's own. The College's published Academic Regulations provide a student complaints process —

written complaint to the Assistant Dean, investigation, written resolution, appeal to the Dean within 10 business days, the Dean's decision final — and the complaint pleads: "This process was never offered to Plaintiff in January. Instead, Plaintiff's complaints were routed to Mario Scalora and Investigator Gose, with no appeal process." (FAC ¶94.) At orientation, Assistant Dean Brummond had students hand-sign the College of Law's Honor Code and said, "This is a contract." (FAC ¶95.) Count II pleads the promises: professionalism, fairness in academic evaluations, and an educational environment as promised by the Board and the State "by itself and through its agents at the University of Nebraska College of Law" (FAC ¶148). Count III pleads the contract's sources: "the university's official policies, student codes of conduct, guarantees of academic freedom, and explicit institutional commitments" (FAC ¶154). The complaint even pleads the Nebraska authorities the University defendants' brief must answer (FAC ¶151). A student-university contract drawn from the institution's own publications is the pleaded claim; the terms are in the defendant's own documents.

**4. The Negligence Counts Plead Duty from the College's Own Undertakings (Entry 36 § D)**

The University defendants argue that Counts IV and V are immunity-barred and plead no duty. Immunity is answered at Part I, Argument points 2–3, and point 2 of this Part. Duty is pleaded from the College's own undertakings and regulations: the Board "owed a specific duty to properly train, supervise, and control its faculty members, administrators, and deans to ensure they comply with university policies, Nebraska's anti-hazing statute, and basic standards of pedagogical professionalism" (FAC ¶160), and breached by, among other things, "[f]ailing to intervene and take corrective remediation steps after receiving explicit, direct notice of escalating faculty hostility" (FAC ¶161). Count V pleads recklessness (FAC ¶165). Nor does the

discretionary-function exception reach duties the College's own regulations impose; a published duty is not a discretionary choice. A duty the institution published and then ignored is not a duty the pleading lacks.

**5. Count IX: Section 504 Leads, and the ADA Is Pleaded in the Alternative (Entry 36 § E)**

The University defendants argue that Plaintiff is not a qualified individual, identified no denied accommodation, and pleads no Fourteenth Amendment conduct. As to qualification: Plaintiff "was diagnosed by the University's own assigned therapists with Unspecified Schizoaffective Disorder and Unspecified Bipolar Disorder," made "after reviewing Plaintiff's medical records for the past three years," and "[t]he Plaintiff is a qualified individual with a disability." (FAC ¶201.) The argument that his later academic dismissal defeats qualification asks the Court to decide, on the pleadings, that the consequences of the challenged conduct excuse the conduct; causation is a fact question. As to notice and denial: the Board and the State "were notified of Plaintiff's claim for accommodations," "had actual and explicit notice of his diagnoses," and "openly recognized his need for accommodation by directly providing and expanding his access to institutional mental health therapy sessions" (FAC ¶200) — while, through the Services for Students with Disabilities office and Pablo Rangel, they "failed to provide Plaintiff with any reasonable accommodations, failed to engage in a meaningful interactive process, and instead subjected him to administrative barriers" (FAC ¶202; the SSD exchange is pleaded at FAC ¶¶72–73). Therapy is not an academic accommodation, and recognition without accommodation is the pleaded violation. Defendants provided the therapy only as the condition that will allow Plaintiff to return to classes (FAC ¶70). SSD did not engage Plaintiff in a process to discover what accommodations he may need: SSD never approved his

extra-time request, never denied it, and concluded that the request was not trustworthy (FAC ¶73), and Defendant Brummond reported that SSD was “very suspicious” because Plaintiff gave a Gmail address to reach his provider instead of a phone number; SSD never proceeded (FAC ¶74). Plaintiff did not abandon the request: he authorized SSD to contact his provider on January 29, January 30, and February 2, 2026, gave SSD the means to contact the provider on February 4, and on February 5 Rangel stated that he would email the provider and update Plaintiff; SSD then gave no response (FAC ¶¶72–73). The nexus is in the pleading: Plaintiff's provider completed and signed the verification documentation SSD required, and that documentation requested the extra time (FAC ¶71). Immunity is answered as in Part I, Argument point 4: Section 504 proceeds on the § 2000d-7 waiver (FAC ¶¶20, 199), and the ADA is pleaded in the alternative under *Lane* and *Georgia* as applied to conduct that violates the Fourteenth Amendment — which Count IX alleges in terms (FAC ¶199).

**6. Count I States a Title VI Claim — Knowledge, Notice, and a Response the Pleading Shows Was Not Reasonable (Entry 36 § F)**

The University defendants dispute deliberate indifference under *Mungai v. University of Minnesota, 141 F.4th 959, 965* (8th Cir. 2025), arguing both the hostile-environment and disparate-treatment theories fail. The elements they invoke are pleaded. Actual knowledge: the January 19, 2026 "Student of Concern" email and its forwarding from Brummond to Moberly (FAC ¶¶88–89); the consultation with a police investigator before Plaintiff's reassignment (FAC ¶90); the reassignment settled with the Dean (FAC ¶91). Notice to appropriate persons: Brummond and Moberly are the College's Associate Dean and Dean — the officials with authority to institute corrective measures. A response not clearly unreasonable: the pleading

alleges the College's own complaints process was never offered (FAC ¶94), that complaints were routed to a police investigator and through a threat-assessment channel instead (FAC ¶¶90–94), that the Dean was routinely briefed and "did not think to offer other formal grievance channels or grade appeal" (FAC ¶93), and that a faculty-affairs inquiry about Plaintiff's own report had to ask the Dean, "Is this something you can follow up on?" (FAC ¶92). Count I pleads the conclusion the standard requires — "actual knowledge" and "deliberate indifference" (FAC ¶¶138, 145) — on those facts. Intentional discrimination is pleaded the way *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), teaches it is proved: disparate treatment of the only student in the 2028 class who wore a suit each day (FAC ¶30); comparators not subjected to the remarks or the evidence-free accusation (FAC ¶¶43, 140–142); departures from the institution's normal procedures (FAC ¶¶92–94); and the decision-makers' contemporary statements (FAC ¶¶33, 46 — "You are always dressed to the nines"). The defendants' position that their response forecloses deliberate indifference is a merits characterization of their own conduct, not a pleading defect.

**7. Count VI States an Equal Protection Claim, and Qualified Immunity Does Not Resolve It Here (Entry 36 § G)**

Count VI pleads that Plaintiff "was effectively a class of one satisfactory to the Olech standard," that he "was the only student in the 2028 class who wore a suit each day," and that Defendants "intentionally singled him out for treatment different from every other student, without any rational basis for the difference in treatment." (FAC ¶178; see FAC ¶¶175, 177.) *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). The anticipated *Engquist* argument governs public employment; Plaintiff is a student, and education is not within its holding. The

count's race-based theory stands independently on the same paragraphs. Qualified immunity is an affirmative defense rarely resolved for a defendant on a motion to dismiss unless the absence of clearly established law appears on the face of the complaint; intentional, race-based differential treatment of a student by university officials is not such a case.

**8. Count VII: the Process That Existed on Paper Was Diverted (Entry 36 § H)**

The University defendants argue that Plaintiff identifies no protected interest, received all process due, and that Brummond and Moberly bear no personal liability. The property interest is built from the institution's own rules: the published complaints and appeal process (FAC ¶94) is a *Roth*-source entitlement the College created and then withheld — complaints routed to Scalora and Gose (FAC ¶94), no formal grievance channels or grade appeal offered (FAC ¶93). *Board of Curators v. Horowitz* deference answers academic judgments; it does not answer the denial of the institution's own stated procedures, and the pleaded pretext facts (FAC ¶¶88–92) contest the "academic" characterization. The autonomy attack carried in the October brief was aimed at an earlier, general allegation; the First Amended Complaint pleads the interest as carefully described: "personal autonomy, specifically the liberty of an enrolled student, who is not a government employee and was subject to no published dress regulation, to govern his own personal appearance by wearing a suit and shoes, the historic and traditionally customary attire of the American legal profession he was training to enter." (FAC ¶185.) *Kelley v. Johnson*, 425 U.S. 238 (1976), upheld grooming rules for police officers — the government as employer — and assumed the appearance interest; it decided nothing about non-employee students. Personal involvement is pleaded act by act against Brummond and Moberly (FAC ¶¶88–95), which also answers the supervisory-liability point: these are allegations of their own conduct, not respondeat

superior.

**9. Count VIII: Attire as Protected Symbolic Speech (Entry 36 § I)**

Count VIII pleads that "Plaintiff's attire constituted protected symbolic speech and expression under the First Amendment." (FAC ¶192.) The adverse acts are the pleaded sequence: the attire comments beginning in the first weeks of class (FAC ¶33), the classroom remarks (FAC ¶¶40–42), the April 6, 2026 episode in which Defendant Schutz touched Plaintiff's suit and announced, "I am wearing my suit today" (FAC ¶100), and the evidence-free academic accusation and its reversal (FAC ¶¶140, 142). The same appearance facts pleaded here carry no *Glucksberg* screen; the claim is retaliation for, and chilling of, protected expression; the deterrence element is pleaded in terms (FAC ¶195), on a continuous course of comments and correspondence (FAC ¶194). Qualified immunity does not resolve it on these pleadings for the reasons stated in point 7 of this Part.

**10. Count X States a Defamation Claim, and the Privilege Is Lost on the Pleaded Fault (Entry 36 § J)**

The publication chain is pleaded: Defendant Jefferis "communicated … an implicitly derogatory statement to a third party, Defendant Brummond, who communicated those same statements" onward (FAC ¶206), on the documentary record the complaint quotes (FAC ¶¶88–89). Fault is pleaded: Jefferis acted with the intention to injure Plaintiff's academic capabilities and integrity (FAC ¶208), and "[s]he had reasonable avenues and tools available to her to verify the truth value of her statements prior to uttering them" and did not (FAC ¶209). A common-interest privilege is lost on abuse and actual malice; the pleaded fault defeats the privilege at this stage. As to immunity: Count X is pleaded against Defendant Jefferis for her

own statements. The defendants cannot have the intentional-tort point both ways — arguing (as the State does) that intentional torts fall outside the Tort Claims Act's waiver when the State is sued, and that an intentional-tort claim against the individual is channeled into that same Act when she is.

11. Count XI Pleads Agreement, Overt Acts, and Conduct Outside the Scope (Entry 36 § K)

Count XI pleads that the individual defendants, "acting implicitly in concert and in their individual capacities, entered into a common agreement … outside the scope of their employment duties" (FAC ¶212), with overt acts pleaded (FAC ¶214) and documented in the reassignment sequence (FAC ¶¶88–91) and the March 2026 routing (FAC ¶92), including the use of institutional documentation to build the narrative the count describes. The individual-capacity, outside-the-scope pleading answers the intracorporate-conspiracy doctrine at the pleading stage. The underlying torts are Counts V and X, answered in points 4 and 10 of this Part.

**12. Count XIV: Interception of Telephone Calls Required a Court Order Under § 2518**

The live interception of the contents of a person's telephone calls is lawful only under a court order issued on the showing Title III requires. 18 U.S.C. § 2518; Neb. Rev. Stat. § 86-293. Count XIV rests on Captain Backer's own words, pleaded verbatim: on June 8, 2026, in an email produced in the school's FERPA records, Backer stated, "I've been monitoring email and calls, and Sgt. Conradt is back in play for UNLPD." (FAC ¶230.) The complaint pleads that the email was notification that UNLPD was intercepting Plaintiff's telephone calls (FAC ¶231); that the University issued Plaintiff no telephone and his calls were made and received on his personal cell phone (FAC ¶¶233–234); that he "was never served with an inventory under 18 U.S.C. § 2518(8)(d)" (FAC ¶235); and that no order under § 2518 or § 86-293, and no other lawful

authorization or consent, permitted the interception (FAC ¶236). Section L of the renewed brief (Entry 36, at 80–83) does not dismiss this count. Its immunity arguments run only to BRUN as an arm of the State. Captain Backer is not among the brief's movants, and Count XIV pleads against BRUN and Backer; Backer is a "person" under 18 U.S.C. §§ 2511(1) and 2520(a) on the brief's own reading, and no arm-of-the-State immunity argument reaches him. Immunity bars damages against BRUN; it does not bar declaratory relief. The brief calls Count XIV a damages-only claim, citing FAC ¶238, but the Prayer for Relief requests a declaratory judgment that Defendants' acts violate the Constitution of the United States (Prayer A). Its plausibility argument asks the Court to read Backer's sentence as a captain watching his own inbox. The pleading supplies the context: the sentence sits in a chronology in which every communication concerns Plaintiff (FAC ¶131(m)), it went to the administrators and officers who handled Plaintiff, and the same chain reports monitoring results on "T.L." one month later (FAC ¶131(n)). Plaintiff's plausible inference controls at this stage. The device and method details the brief demands are the details the § 2518(8)(d) inventory supplies; it was never served (FAC ¶235).

**13. In the Alternative: Leave to Amend, No Dismissal with Prejudice, and Rule 56(d) Protection**

If the Court finds any count wanting, Plaintiff requests leave to amend under Rule 15(a)(2); the amendment record in this case shows diligence, and defects identified at the pleading stage, if any, are curable. No dismissal should be with prejudice. If the Court converts any part of either motion under Rule 12(d), Plaintiff is entitled under Rule 56(d) to a reasonable opportunity to present material and to discovery, and Plaintiff had none: the FERPA production is partial, and the discovery needed includes the full faculty Rules and Regulations (which the

College's own published page states are available only in the Dean's Office), the claims files, and the complete institutional record set concerning Plaintiff.

**6. Conclusion**

The State is liable for all claims against it because it actively cast itself as one entity with the named defendants authorizing them to conduct themselves in the way they did to injure the Plaintiff. For the same reasons stated in Part II, the University (BRUN) Defendants are liable on the claims against them, and their motion fails on the same record. Both Motions to Dismiss should be denied. In the alternative, Plaintiff requests leave to amend as to any count the Court finds wanting, and objects to any dismissal with prejudice.

Date: November 25, 2026
/s/ Tyreese Learmond
301 Centennial Mall South
P.O. Box 94634
Lincoln, NE 68508
tyreeselearmond@astreet.cloud
Plaintiff, *pro se*